1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8

9   **ROSIE BOPARAI, M.D.,**              )        **CASE NO. 1:09-CV-1164 AWI JLT**
                                          )
10             **Plaintiff,**             )        **ORDER GRANTING**
                                          )        **DEFENDANT'S MOTION FOR**
11       **v.**                           )        **SUMMARY JUDGMENT**
                                          )
12  **ERIC SHINSEKI, Secretary of Veterans**  )
    **Affairs, United States Department of**  )
13  **Veterans Affairs,**                 )
                                          )
14             **Defendant.**             )        (Docs. 65 and 102)
    _____      )

15

16

17                        **I. History**

18         Plaintiff Dr. Rosie Boparai ("Plaintiff") is a primary care physician who also performs

19  primary care dermatological services.  She has been employed by Defendant U.S. Department of

20  Veterans Affairs ("Defendant") since 2000 at the Bakersfield Community-Based Outpatient

21  Clinic, part of the Greater Los Angeles Healthcare System. ("GLA").  Plaintiff first filed an

22  Equal Employment Opportunity Commission ("EEOC") complaint in 2002, alleging employment

23  discrimination.  On October 17, 2006, Plaintiff filed another EEOC complaint for race and

24  national origin discrimination against JoAnn Van Horn (direct supervisor for administrative

25  matters), Dr. Robert Gaines (direct supervisor for medical matters), and Dr. Lisa Altman (second

26  level supervisor).  That case (EEO Case No. 200P-0691-2006103633) is still proceeding through

27  the EEOC administrative process and is not the subject of this case.

28         On July 13, 2006, Plaintiff treated a patient ("Patient") for a skin rash on his legs in the

                                            1

Bakersfield facility. Plaintiff diagnosed the condition as dermatitis (a kind of skin inflammation) and prescribed topical steroid cream. Plaintiff saw the Patient again on August 4, 2006 and September 28, 2006. Plaintiff noted the dermatitis was improving. On October 27, 2006, Patient came to a different GLA facility in Los Angeles. There, he was seen by Dr. Mary White who ordered a biopsy which determined the Patient had skin cancer. The Patient was treated with radiation therapy but died on March 12, 2007.

On October 31, 2006, Dr. White referred the case to the GLA's Patient Safety Department over concerns about Plaintiff's treatment. GLA's peer review process involves another doctor practicing in the specialty reviewing the case file to determine what level of care was provided; the identity of the reviewer is confidential and the results of the review may only be used for limited purposes. Dr. Lester Jones, Chairman of the Peer Review Committee, initiated a peer review of Plaintiff's treatment of the Patient ("Peer Review"). One doctor reviewed the file in November 2006 and a second reviewed the file in March 2007. Both determined the care to be Level II, which means "Most experienced, competent practitioners might have managed the case differently." The results were presented to the Peer Review Committee on May 15, 2007. Dr. Jones informed Plaintiff of the Peer Review results on July 19, 2007. Plaintiff provided a written response on July 26, 2007 and requested a hearing before the Peer Review Committee. Dr. Jones left the GLA's employ and Dr. Leonard Kleinman, an existing Peer Review Committee member, took the position of Chairman. On September 18, 2007, Plaintiff spoke to the Peer Review Committee by phone. On October 16, 2007, the Peer Review Committee voted to adopt the Level II finding. Plaintiff requested further review and was told that there was no appeal procedure. The Peer Review Committee closed the case on December 18, 2007.

On February 15, 2007, his family contacted GLA's Patient Safety Department questioning the delay in Patient's care. On March 1, 2007, Dr. Jones and Dr. Dean Norman, Chief of Staff of the GLA, met with the Patient. On May 31, 2007, after the Patient passed away, Dr. Jones met with his family and made a clinical disclosure in which Defendant accepted responsibility for a delay in diagnosis ("Disclosure").

1   Plaintiff asserts these events surrounding scrutiny of her treatment of Patient and

2   Disclosure are the result of retaliation for her prior EEOC complaints.  Plaintiff contacted an

3   EEOC counselor on September 7, 2007.  After discussing the matter with the counselor, Plaintiff

4   was granted a Notice of Right to File a Discrimination Complaint on December 13, 2007.

5   Plaintiff then formally filed a complaint with the EEOC (VA Form 4939) on December 26, 2007.

6   The EEOC accepted her complaint on February 11, 2008.

7   Plaintiff filed suit on September 6, 2009; she is proceeding pro se.  Non-expert discovery

8   was set to close September 16, 2010 and expert discovery was set to close December 16, 2010.

9   Doc. 14.  Plaintiff sought to extend the time for discovery but only the expert discovery deadline

10  was extended to December 31, 2010. Doc. 56.  On January 20, 2011, Defendant filed the present

11  motion for summary judgment. Doc. 65.  Plaintiff did not file any response, and the matter was

12  taken under submission.  Plaintiff then informed the court that she did not receive notice of the

13  motion so she was given time to file an opposition.  On March 9, 2011, Plaintiff also made a

14  motion to reopen discovery. Doc. 74.  On March 18, 2011, the court determined that there was no

15  grounds to reopen discovery especially as the record showed that Plaintiff was not diligent in

16  pursuing discovery. Doc. 77.  On March 28, 2011, Plaintiff filed her timely opposition. Docs. 78-

17  87.  On April 18, 2011, Plaintiff filed an amended opposition and additional evidence without

18  leave of court. Docs. 94-95.  Defendant made a motion to strike these documents. Doc. 96.  The

19  court denied the motion, allowing Defendant to file a new reply. Doc. 97.  Then, Plaintiff made

20  another filing of additional evidence without leave of court. Doc. 100.  Defendant again sought to

21  have the additional material stricken. Doc. 102.

22

23                                    **II. Legal Standards**

24  Summary judgment is appropriate when it is demonstrated that there exists no genuine

25  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

26  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

27  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

28  judgment bears the initial burden of informing the court of the basis for its motion and of

**3**

identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008).  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Stegall v. Citadel Broad,

**4**

1  *Inc.*, 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

2  and it is the opposing party's obligation to produce a factual predicate from which the inference

3  may be drawn. See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006);

4  UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

5  material fact does not spring into being simply because a litigant claims that one exists or

6  promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d

7  15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

8  Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

9  "motion for summary judgment may not be defeated ...by evidence that is 'merely colorable' or

10 'is not significantly probative.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986);

11 Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has

12 the discretion in appropriate circumstances to consider materials that are not properly brought to

13 its attention, but the court is not required to examine the entire file for evidence establishing a

14 genuine issue of material fact where the evidence is not set forth in the opposing papers with

15 adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir.

16 2003).  If the non-moving party fails to produce evidence sufficient to create a genuine issue of

17 material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine Ins.

18 Co. v. Fritz Companies, 210 F.3d 1099, 1103 (9th Cir. 2000).

19

20                    **III. Statement of Material Facts**

21 1. In 2000, the Veteran's Administration ("VA") hired Dr. Rosie Boparai ("Dr. Boparai") as a

22 Staff Physician in the Bakersfield Community-Based Outpatient Clinic in the Greater Los

23 Angeles Healthcare System ("GLA").

24

25 2. In February 2005, Dr. Boparai expanded her primary care practice to include some

26 dermatology under the supervision of qualified dermatologists in Los Angeles.

27

28 3. On July 13, 2006, Dr. Boparai treated a patient ("patient") in the Bakersfield primary care

clinic for a skin rash on his legs, including a spot on his right leg.

4. Dr. Boparai diagnosed the condition as dermatitis, which is skin inflammation due to direct contact with an irritating substance or to an allergic reaction, and prescribed a topical steroid cream.

       Disputed.

5. Dr. Boparai saw the patient again on August 4, 2006, and noted that the condition was "improving."

6. Dr. Boparai saw the patient on September 28, 2006, and noted "slight improvement" and advised the patient to follow up as needed if there was a change in health status or a worsening condition.

7. Dr. Boparai did not order a biopsy nor did she refer the patient to a dermatologist.

8. One month later, on October 27, the patient came to Urgent Care at the VA facility in West Los Angeles, complaining of a lesion on his right leg that he had had for three months and that was not responding to topical creams.

       Disputed.

9. The lesion was a 2 centimeters by 2.5 centimeters papule (a solid raised bump in the skin) that was necrotic and smelled.

10. Dr. Mary White, the Urgent Care Team Leader, ordered a biopsy which confirmed squamous cell carcinoma, a type of skin cancer, and the patient was referred to the Dermatology Department for cancer treatment.

11. The patient died on March 12, 2007.

12. Physicians at the VA are subject to Peer Review for Quality Management ("peer review") as a condition of their employment.

     Disputed.

13. Peer review is a process intended to promote confidential and systematic processes that contribute to quality improvement efforts at the individual provider level, within a non-punitive context.

     Disputed.

14. All deaths must be screened against death review criteria and exceptions to death review criteria.

     Disputed.

15. Peer review findings are confidential and they may not be used to take personnel actions such as reassignment, changes in privileges, and demotions.

     Disputed.

16. On October 31, 2006, Dr. White, the VA doctor who diagnosed the patient's skin cancer, referred the matter to the Patient Safety Department because she was concerned about the quality of care that he had received.

17. Dr. White did not know Dr. Boparai or that Dr. Boparai had any prior EEO activity.

18. Dr. Lester J. Jones, Associate Chief of Staff for Quality Assurance and Chairman of the Peer Review Committee, initiated peer review pursuant to VA policy.

19. Dr. Jones was not Dr. Boparai's supervisor and he did not know that Dr. Boparai had prior EEO activity.

20. An independent medical peer reviewer initially reviewed Dr. Boparai's care of the patient a few days later.

21. VA peer review assesses patient care as one of three levels:

Level 1 - Most experienced, competent practitioners would have managed the case similarly in all relevant aspects.
Level 2 - Most experienced, competent practitioners might have managed the case differently in one or more of the relevant aspects.
Level 3 - Most experienced, competent practitioners would have managed the case differently in one or more of the relevant aspects.

Disputed.

22. The reviewer deemed Dr. Boparai's care as Level 2. Because care was identified as Level 2, a second review was sought.

23. The second peer reviewer separately deemed Dr. Boparai's patient care as Level 2 on March 12, 2007.

24. The "levels of care" used by the VA are for quality assessment purposes and are not the same as the standard of care used in medical liability cases.

Disputed.

25. On July 19, 2007, Dr. Jones advised Dr. Boparai that peer review was performed for the purpose of assessing quality of care and that peer reviewers deemed that most practitioners might have handled the case differently (Level 2).

26. Dr. Jones asked Dr. Boparai to provide her input and advised her that she could appear before

the Peer Review Committee.

27. Dr. Boparai provided a written response dated July 26, 2007, and requested the opportunity to address the Committee.

28. On September 18, 2007, Dr. Boparai provided her input by telephone to the Peer Review Committee.

29. Dr. Jones was not present because he left the employment of the VA prior to the meeting.

30. Instead, Dr. Leonard Kleinman, the newly appointed Chair of the Peer Review Committee, presided.

31. After hearing Dr. Boparai's comments and reviewing her written statement, the Committee took the matter under submission.

32. On October 16, 2007, after two medical reviews and a rebuttal opportunity by Dr. Boparai, a quorum of the Peer Review Committee voted to sustain the Level 2 findings.

   Disputed.

33. Dr. Kleinman informed Dr. Boparai of the results and actions taken by the Peer Review Committee in a written memorandum dated October 18, 2007.

34. Although Dr. Boparai requested further review, the GLA has no such procedure.

35. The Peer Review Committee closed the matter on December 18, 2007.

36. Aside from sustaining patient care as Level 2, the Peer Review Committee took no other

action and made no other recommendations.

37. Consistent with the non-punitive nature of peer review, there was no reprimand.

38. The findings of the Peer Review Committee were kept confidential.

39. There was no mention of the peer review in Dr. Boparai's performance evaluations, and her final evaluations rated her performance as "outstanding," which is the highest rating available.

     Disputed.

40. Dr. Boparai received routine compensation increases.

41. Dr. Boparai remained eligible for incentive awards.

     Disputed.

42. Dr. Boparai did not lose any of her medical privileges.

     Disputed.

43. There were no other peer reviews involving Dr. Boparai's patient care.

44. Dr. Boparai's expert witnesses have concluded that the medical records show that it was medically appropriate to initiate peer review regarding Dr. Boparai's patient care in this case.

     Disputed.

45. Dr. Kim concluded that reasonable physicians could disagree whether Dr. Boparai's patient care should be described as Level 2.

     Disputed.

46. The VA also has a separate policy requiring Disclosures to patients.

47. This policy recognizes that the VA has an obligation to disclose adverse events to patients consistent with its core values of trust, respect, excellence, commitment and compassion which includes ensuring that patients are aware of the Tort Claims process.

48. On February 15, 2007, approximately a month before the patient died, the patient's family contacted the Patient Safety Department with concerns regarding quality of care.

       Disputed.

49. Dr. Jones met with the patient to investigate the patient's concerns on March 1, 2007.

50. At Dr. Jones' request, Dr. Dean Norman, Chief of Staff, accompanied him to the meeting.

51. On or about May 31, 2007, Dr. Jones determined that a Disclosure should be made pursuant to VA policy.

       Disputed.

52. Dr. Norman was not involved in this decision.

       Disputed.

53. Dr. Jones and other VA officials (not including Dr. Norman) met with the patient's family.

54. The VA accepted responsibility for the entirety of the patient's care.

55. There was no mention of Dr. Boparai or peer review.

       Disputed.

1   56. Dr. Jones drafted the Disclosure which was entered on the patient's medical record.

2

3   57. Before she received a final determination from the Peer Review Committee or even

4   addressed the Committee in September, Dr. Boparai contacted an EEO counselor and

5   complained that she believed peer review was reprisal for prior EEO activity initiated in 2006,

6   even though peer review "appear[ed] innocent and innocuous on the surface."

7        Disputed.

8

9   58. The prior EEO activity was an action Dr. Boparai had initiated exactly one year earlier (EEO

10  case No. 200P- 0691-2008103633) against her administrative supervisor in Bakersfield for race

11  discrimination and hostile work environment for assigning too heavy a case load and the manner

12  in which leave requests were handled.

13       Disputed.

14

15  59. On December 12, 2007, Dr. Boparai submitted her Complaint of Employment Discrimination

16  to the EEOC. She alleged that peer review was reprisal for the prior EEO complaint and

17  requested reversal of the peer review findings.

18       Disputed.

19

20  60. The following claim was reviewed: Whether Complainant was discriminated against on the

21  basis of reprisal for prior EEO activity (EEO case No. 200P-0691-2008103633) when on August

22  21, 2007, a Peer Review Committee assigned Level II [sic] (Failure to Diagnose) to her patient

23  care on one of her cases.

24       Disputed.

25

26  61. After investigation, the claim was denied because the VA articulated legitimate reasons for

27  peer review. Dr. Boparai's complaints about the VA's quality management review of its medical

28  care delivery services were determined to be not within the purview of the EEOC.

62. On July 6, 2009, Dr. Boparai filed her Complaint in this action, alleging: "Peer review committee is appointed by management and I believed this was reprisal for my prior EEOC complaint in 2006..."

      Disputed.

63. The only allegation is reprisal for prior EEO activity.

64. Dr. Boparai identified three responsible management officials: Dr. Norman; Dr. Kleinman; and Dr. Lisa Altman.

65. Dr. Norman was not a member of the Peer Review Committee at the time and he did not make any
decisions regarding peer review or Disclosure.

      Disputed.

66. Dr. Kleinman was the Chair of the Peer Review Committee after September 2007, he was not Dr. Boparai's supervisor, and he had no knowledge of Dr. Boparai's prior EEO activity.

      Disputed.

67. Dr. Altman is Associate Chief of Staff (ACOS) for Primary and Ambulatory Care and Dr. Boparai's second-level supervisor.

68. Dr. Altman had no knowledge of peer review or Disclosure.

      Disputed.

69. Dr. Altman gave Dr. Boparai "outstanding" performance evaluations.

      Disputed.

### III. Discussion

This case involves a claim that Defendant retaliated against Boparai for filing a complaint with the EEOC.  For a claim of retaliation in violation of Title VII, "a plaintiff  must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two. Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. Only then does the case proceed beyond the summary judgment stage." Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000), citing Payne v. Norwest Corp., 113 F.3d 1079, 1080 (9th Cir. 1997).  As a preliminary matter, Defendant contends part of Boparai's claims fail for lack of administrative exhaustion.  On the substantive merits, Defendant also contends that Boparai can not show any adverse employment action or show a causal link between her EEOC complaint and her treatment at work.

**A. Administrative Exhaustion**

Defendant argues "Dr. Boparai has failed to administratively exhaust any claims arising from Disclosure. She did not refer to the Disclosure in her Complaint of Employment Discrimination. It was not accepted as a claim in the Notice of Acceptance. It was not investigated or addressed in the Final Agency Decision. Moreover, it was not pleaded in her complaint." Doc. 65, Part 1, Brief, at 9:9-13, citations omitted.

In her complaint to the EEOC, Boparai alleged, "Reprisal. Peer review committee assigned Level II (failure to diagnose) to my patient care when there was no failure to diagnose on my part. There was failure to treat timely by GLA and no action was taken as far as I know. I believe this was done because my EEO claim against management. Date of occurrence: August 21, 2007." Doc. 95, Ex. 8, at 52 of 83.  The EEOC stated her "complaint of discrimination raises the following claim: (A) Whether complainant was discriminated against on the basis of reprisal for prior EEO activity [] when on August 21, 2007, a Peer Review Committee assigned Level II (Failure to Diagnose) to her patient care on one of her cases." Boparai Deposition, Ex. 3, Feb. 21,

2008 EEOC Letter Accepting Complaint.  The Final Agency Decision then expanded  the scope

of the claim by characterizing it as "Whether the agency discriminated against the complainant

based on reprisal for prior EEO activity when on August 21, 2007, management referred the

complainant's medical case to a Peer Review Committee that made a Level II Finding." Doc. 66,

Ex. 2, at 2.  This put at issue both the conclusion of Level II care and the initial decision to refer

the matter to a Peer Review Committee.  Boparai's complaint filed in the Eastern District alleged

"Patient care was reviewed by the Peer Review Committee that deemed my care as Level II

meaning most physicians would have treated the patient differently. Also open disclosure was

done and note written in chart that delay in diagnosis of 3 months resulted in poor outcome."

Doc. 1, Complaint.  The Joint Scheduling Report characterizes the claim as "Plaintiff brings this

complaint under Title VII alleging reprisal for filing EEO complaints with unfavorable Peer

Review and Open Disclosure of Adverse Outcome to patient's family in which blame was

directed to the defendant. Furthermore GLA policies were not followed in doing so." Doc. 12, at

1:25-2:2.

The Ninth Circuit has said,

Under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely charge with the EEOC, or the appropriate state agency, thereby affording the agency an opportunity to investigate the charge....Subject matter jurisdiction extends over all allegations of discrimination that either fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. We construe the language of EEOC charges with utmost liberality since they are made by those unschooled in the technicalities of formal pleading....

Allegations of discrimination not included in the plaintiff's administrative charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge. In determining whether a plaintiff has exhausted allegations that she did not specify in her administrative charge, it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred. In addition, the court should consider plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case.

B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1099-1100 (9th Cir. 2002); see also Rush v.

McDonald's Corp., 966 F.2d 1104, 1112 (7th Cir. 1992) ("the appropriate standard for measuring

1  exhaustion is not those charges that the EEOC in fact considered, but those that were brought to

2  its attention"). In key part, the Final Agency Decision states, "According to the complainant,

3  because of the negative treatment outcome that resulted in a mortality case, the first level

4  supervisor at that time, Dr. LJ, and the Chief of Staff, Dr. DN, met with family members of the

5  deceased." Doc. 66, Ex. 2, at 2. Boparai's complaint was grounded on allegations of retaliation.

6  As part of the investigation, Boparai clearly informed the EEOC that Disclosure was made. That

7  allegation fits within the stated legal theory of retaliation and is related to the allegations included

8  in the complaint. Disclosure must be considered administratively exhausted. Again,

9  "Administrative claims are to be construed broadly in the Title VII context." Davis v. Team Elec.

10  Co., 520 F.3d 1080, 1091 n.5 (9th Cir. 2008).

11      In addition to referral to Peer Review, Level II finding, and Disclosure, Plaintiff discusses

12  "other adverse actions." Doc. 94, Amended Opposition, at 21:14. First, Plaintiff asserts she was

13  denied two salary increases on September 17, 2006. Doc. 94, Amended Opposition, at 21:20-22.

14  This is an action that predated and is completely separate from the issues of her treatment of

15  Patient. This claim was never part of her EEOC complaint or her complaint in district court.

16  Further, Plaintiff did not file her racial and/or national origin discrimination complaint until

17  October 17, 2006; given the timing, denial of salary increases can not constitute retaliation for

18  that filing.

19      Second, Plaintiff refers to a decrease in her performance ratings and the cancellation of

20  her dermatology clinic. Doc. 94, Amended Opposition, at 21:15-22:17. Plaintiff's performance

21  ratings for October 2007-September 2008 and October 2008-September 2009 were lower than in

22  prior years. Boparai Declaration, Exs. 9-12. Plaintiff's dermatology clinic was discontinued in

23  June 2008. Looking at the Final Agency Decision, neither issued was examined by the EEOC.

24  Doc. 66, Ex. 2. These are unexhausted issues that are not part of this case.

25      Plaintiff also alleges a number of litigation related violations constitute retaliation: "VA

26  ORM did incomplete investigation (See below) and GLA stonewalled with Title 38, 5705

27  privilege which should not have been applicable. VA OEDCA made factual errors in interpreting

28  the ORM record and came up with flawed decision. I filed current action and was retaliated

again[st] with letter from ACOS and threat of disciplinary action by an HR employee on 2/16/2010, one day before scheduling conference (See below) which left a chill in me and I had to rethink civil action and put off discovery. When I initiated discovery, Defendant failed to disclose a single document leading to Motion to Compel and he disclosed requested documents after discovery ended and I was unable to depose defendant's witnesses and the court denied my request to extend discovery." Doc. 94, Amended Opposition, at 3:9-17.  To be clear, litigation tactics do not constitute evidence of retaliatory animus.  Plaintiff fails to show how any of these other issues have been administratively exhausted.  Further, they were never raised in the complaint though some of these events predate its filing.  They are not part of this case.

**B. Adverse Employment Action**

Defendant contends, "Neither peer review nor Disclosure is an adverse action, as they do not materially affect the terms and conditions of employment, nor are they materially adverse such that they would dissuade a doctor from making or supporting a charge of discrimination." Doc. 65, Part 1, Brief, at 11:12-14.  The Ninth Circuit has stated

> The EEOC has interpreted 'adverse employment action' to mean 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.' Although EEOC Guidelines are not binding on the courts, they constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. We find the EEOC test to be consistent with our prior holdings, and with the holdings in the First, Seventh, Tenth, Eleventh and D.C. Circuits.
>
> The EEOC test covers lateral transfers, unfavorable job references, and changes in work schedules. These actions are all reasonably likely to deter employees from engaging in protected activity. Nonetheless, it does not cover every offensive utterance by co-workers, because offensive statements by co-workers do not reasonably deter employees from engaging in protected activity.
>
> As we stated in Hashimoto, the severity of an action's ultimate impact (such as loss of pay or status) 'goes to the issue of damages, not liability.' Instead of focusing on the ultimate effects of each employment action, the EEOC test focuses on the deterrent effects. In so doing, it effectuates the letter and the purpose of Title VII. According to 42 U.S.C. § 2000e-3(a), it is unlawful 'for an employer to discriminate' against an employee in retaliation for engaging in protected activity. This provision does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination.

Ray v. Henderson, 217 F.3d 1234, 1242-43 (9th Cir. 2000), citations omitted.  "[A] plaintiff must

show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006), citations omitted.  There are three discrete acts to be considered: referral to peer review, the Level II finding, and the Disclosure.

Defendant offers precedent from the Seventh Circuit for the proposition that medical peer reviews in general are not adverse employment actions under a retaliation claim: "Patt has not offered evidence to show that the peer review activities constituted an adverse employment action. The record shows that participating in peer review was a requirement of Patt's contract (like all doctors at Family Health), and that her male colleagues also had cases referred to peer review. Patt has offered no basis to conclude that the number of her cases referred to peer review was inordinate when compared to the number of her male colleagues' cases referred for review. Nor has she offered evidence to suggest that any of her cases were inappropriate for peer review. Accordingly, Patt has failed to establish an adverse employment action." Patt v. Family Health Sys., 280 F.3d 749, 754-755 (7th Cir. 2002).  From the language, it is unclear whether the Seventh Circuit analysis actually addresses what qualifies as an adverse employment action as opposed to determining if there was a legitimate, non-retaliatory rationale for the action; there is no discussion of whether peer reviews are likely to deter anyone from filing a complaint with the EEOC.[1]   Further, the analysis is limited to the number of cases referred for peer review and

---

[1]There may be some difference between Ninth Circuit and Seventh Circuit case law on this matter.  The Ninth Circuit in Ray specifically stated that the EEOC's standard for what constitutes an adverse employment action was consistent with Seventh Circuit precedent. Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000).  However, that contention does not appear to apply in all circumstances.  In the Seventh Circuit, "A change in job title or alteration of job responsibilities, when similar responsibilities and identical salary and benefits are retained, does not constitute an adverse employment action. Grayson v. City of Chicago, 317 F.3d 745, 750 (7th Cir. 2002); Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 745 (7th Cir. 2002) (transfer was not adverse employment action); Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir.1993)." Cruz v. Perry, 2003 U.S. Dist. LEXIS 4933, *20 (N.D. Ill. Mar. 28, 2003).  Yet, the EEOC standard the Ninth Circuit adopted explicitly states that lateral transfers are adverse employment actions. See Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir.

1    whether co-workers had comparable number of referrals, not the results of the peer review.  On

2    the issue of referral, Patt's conclusion appears to be in accord with that of other courts. See Renta

3    v. County of Cook, 2010 U.S. Dist. LEXIS 86195, *36 (N.D. Ill. Aug. 19, 2010) ("Defendants

4    contend that Tomar's May 22, 2003 referral to peer review was not an adverse employment

5    action, and Renta does not contend as much"); Hussain v. Prinicipi, 344 F. Supp. 2d 86, 105

6    (D.D.C. 2004) (discussing what qualified as an adverse employment action, "the hospital referred

7    plaintiff's name to the Peer Review Panel while recommending that he not be reported to the

8    NPDB. The record clearly shows that plaintiff's name was cleared. Plaintiff thus cannot use this

9    action as a basis for a retaliation claim").  The weight of case law suggests that referral to peer

10   review does not constitute an adverse employment action.

11         The parties disagree as to how the results of the peer review can be used.  The GLA's

12   written policy as of January 2007 was that "Results from the peer review process will be used in

13   the validation and verification of continued clinical competence of the medical staff members

14   during the reappointment process....Peer reviews for quality improvement cannot be used to take

15   personnel actions such as reassignment, changes in privileges and demotions." Boparai

16   Deposition, Ex. 6, Peer Review Policy, Sections (1) and (3)(C).  Boparai explains that "We have

17   to apply for reprivileges every two years, and they decide at the time....So they are looking at that

18   information when they're reappointing you, and they will make the decision depending on your

19   peer review." Boparai Deposition, at 71:15-16 and 72:13-16.  That is, a negative peer review will

20   not be used to change employment conditions during the two year appointment but will be used

21   to determine whether the appointment should be renewed at the end of the term.  Defendant has

22   presented no evidence to contradict Boparai's assertion.  In this manner, a finding of fault in a

23   peer review is much more like an unfavorable performance review than a simple negative

24   utterance from a coworker.  The Level II determination must be considered a negative review in

25   light of the fact that Defendant's Disclosure included "accept[ing] responsibility for the delay in

26   diagnosis, providing the patient's family with an SF-95, the administrative precursor to a claim

27   

28   2000).

1  under the Federal Tort Claims Act." Doc. 65, Part 4, Lodge Declaration, at 3:22-23.  "[A]n

2  undeserved negative performance review may constitute an adverse employment action." <u>Lawson</u>

3  <u>v. Reynolds Indus.</u>, 264 Fed. Appx. 546, 548 (9th Cir. 2008), citing <u>Yartzoff v. Thomas</u>, 809

4  F.2d 1371, 1376 (9th Cir. 1987).

5       Regarding Disclosure, the overall policy states "In cases resulting in serious injury or

6  death, or those involving potential legal liability, a more formal process is needed. This process

7  is called institutional disclosure of adverse events. In an institutional disclosure the patient or

8  representative and any family members designated by the patient or representative are invited to

9  meet with institutional leaders and others, as appropriate. An apology is made, and information

10  about compensation and procedures available to request compensation is provided, when

11  appropriate." Doc. 65, Part 5, Ex. 3, Veterans Health Administration Directive 2005-049,

12  Paragraph 2(f)(2)(b).  Defendant states, "Under the Federal Tort Claims Act, any claims for

13  medical malpractice are directed against the United States and the VA, not against any particular

14  provider. The Clinical Disclosure did not name Dr. Boparai as the responsible party. Thus, the

15  disclosure to the patient in this case was a matter of the VA taking responsibility for the care

16  provided to the patient." Doc. 65, Part 4, Jones Declaration, at 3:24-27.  "Among those

17  employment decisions that can constitute an adverse employment action are termination,

18  dissemination of a negative employment reference, issuance of an undeserved negative

19  performance review and refusal to consider for promotion." <u>Brooks v. City of San Mateo</u>, 229

20  F.3d 917, 928 (9th Cir. 2000).  Given the facts in this case, it does not appear that Disclosure

21  qualifies.  Communication with a patient's family can not be considered a negative employment

22  reference.  From what can be gathered, Disclosure was an acknowledgment that the GLA was

23  responsible, not Plaintiff.  The Disclosure (separate from peer review results and other kinds of

24  reporting) does not affect Plaintiff's future employment. See generally <u>Peishu Zheng v. Quest</u>

25  <u>Diagnostics, Inc.</u>, 248 Fed. Appx. 416, 417 (3d Cir. 2007) ("The NPDB is essentially an

26  online-database created by the DHHS to share information on doctors who have adverse

27  employment actions taken against them. Congress established the NPDB 'to restrict the ability of

28  incompetent physicians to move from State to State without disclosure or discovery of the

physician's previous damaging or incompetent performance.' 42 U.S.C. §11101(2). The NPDB is not available to the general public. Only authorized medical health entities and professionals can access its information").  "[B]admouthing an employee outside the job reference context do not constitute adverse employment actions." Brooks v. City of San Mateo, 229 F.3d 917, 929 (9th Cir. 2000).

**C. Causal Link**

Plaintiff provides the depositions of experts who state that her care of the Patient should have been deemed Level I and not Level II. Kim Deposition, at 117:23-118:2; Softa Deposition, at 32:15-22.  Making all inferences in favor of the non-moving party, the question is whether the allegedly incorrect Peer Review conclusion is due to retaliation.  Plaintiff provides little evidence suggesting any causal link between Plaintiff's prior EEOC filing and the Level II determination (or referral to peer review and Disclosure, for that matter).  Regarding a discrimination claim, "a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons." Chuang v. University of Cal. Davis, 225 F.3d 1115, 1127 (9th Cir. 2000).

From the evidence provided, the case was flagged on October 31, 2006 by Dr. White, who did not know Plaintiff and did not know Plaintiff had made any discrimination claims. Doc. 65, Part 7, White Declaration, at 4:1-15.  Dr. Jones received the referral and started the formal peer review process; he was not aware that Plaintiff had made any discrimination claims until December 2010. Doc. 65, Part 4, Jones Declaration, at 4:7-9.  Two peer reviewers, working independently, examined the case and provided two reports, both of which concluded that Plaintiff's treatment qualified as Level II.  The identities of the two reviewers has not been provided as Defendant's policy is to maintain confidentiality to encourage honest opinions. Doc. 65, Part 5, Kleinman Declaration, at 3:24-25.  "Initial reviews are conducted by Peer Reviewers who are individual practitioners within the same profession or discipline and trained in peer review procedures. Reviewers are not members of the Peer Review Committee and they must

21

1  decline the case if they have conflicts." Doc. 65, Part 5, Kleinman Declaration, at 3:17-21.  The

2  identity of the two doctors who conducted the case reviews for Plaintiff's Peer Review are not

3  known and Plaintiff has not appear to argue that the two were biased.  This is a factor that cuts

4  against finding a causal link. Fullard v. City of New York, 274 F. Supp. 2d 347, 357 (S.D.N.Y.

5  2003) ("The discriminatory animus of intermediate supervisors who have input in the

6  decisionmaking process will not give rise to liability if the supervisor with final authority bases

7  an adverse employment action exclusively on an independent evaluation. But the employer will

8  be liable where the decision-maker 'rubber stamps' the recommendation of the subordinates; in

9  such cases, we say that the decision-maker acts as a conduit of the subordinates' improper

10  motive").

11          Plaintiff instead argues that the "Peer Review Committee is appointed by Dr. Norman. It

12  appears Dr. Norman makes his appointments based on nepotism and thus he and his appointees

13  have reasons to retaliate against EEOC complaints to suppress EEOC complaints for self

14  preservation. Doc. 94, Amended Opposition, at 2:17-20.  The locus of Plaintiff's complaint is

15  that the October 16, 2007 Peer Review Committee vote finalizing her Level II determination was

16  retaliatory.  However, Plaintiff provides no evidence that supports this assertion.  Aside from the

17  general statement, she does not specify how individual members of the Peer Review Committee

18  are allegedly biased.  Mere speculation is insufficient; when there is no affirmative evidence that

19  a medical peer review process is biased, summary judgement in favor of the employer is

20  warranted. See Mehta v. HCA Health Servs. of Fla., Inc., 2006 U.S. Dist. LEXIS 79536, *23-24

21  (M.D. Fla. Oct. 31, 2006) ("The record is almost entirely devoid of details regarding the peer

22  review process, and although some of the deposition testimony alludes to the removal of

23  physician members from the peer review investigation, the Court does not have sufficient

24  evidence before it to find that there is a genuine issue for trial. Mehta's testimony that he believes

25  the outcome of the peer review investigation would have been different had Oak Hill not

26  removed the physician members from the process is insufficient. Furthermore, although Mehta

27  filed the Oak Hill Hospital Medical Staff Bylaws, the Court is unable to determine how Oak Hill

28  deviated from these Bylaws during the peer review process"); Tasbas v. Nicholson, 2009 U.S.

1    Dist. LEXIS 43877, *52 (W.D.N.Y. May 26, 2009) ("There is also no evidence that Patel

2    hand-picked doctors to provide negative peer reviews of Plaintiff's cases").

3        "[S]uspicious timing may permit a plaintiff to survive summary judgment if there is other

4    evidence that supports the inference of a causal link." Culver v. Gorman & Co., 416 F.3d 540,

5    546 (7th Cir. 2005). Plaintiff filed an EEOC complaint on October 17, 2006. Her Peer Review

6    was initiated in November. However, as noted above, initiation of the Peer Review is not an

7    adverse employment action and the individuals who did so were unaware of Plaintiff's prior

8    EEOC complaint. The findings of the two reviewers were presented to the Peer Review

9    Committee on May 15, 2007. Plaintiff provided a written response on July 26, 2007 and an oral

10   response on September 18, 2007. The Peer Review Committee voted on the issue on October 16,

11   2007. Dr. Kleinman states that at the time of the vote, he was not aware of Plaintiff's prior

12   EEOC complaint. Doc. 65, Part 5, Kleinman Declaration, at 6:1-2. "In the circumstances, no

13   inference of retaliation arises on account of the nearly twelve-month gap between her protected

14   complaints and termination." Lawson v. Reynolds Indus., 264 Fed. Appx. 546, 547 (9th Cir.

15   2008), citing Manatt v. Bank of America, 339 F.3d 792, 802 (9th Cir. 2003). Timing does not

16   support Plaintiff's claim in this case.

17

18   **D. Additional Materials**

19        Plaintiff has also submitted additional materials that purports to cast doubt on the

20   credibility of Drs. White and Altman. Doc. 100, Sealed Document. Defendant argues that the

21   materials are untimely and should be stricken. Doc. 102. These documents are untimely. The

22   court has already permitted plaintiff additional time to file opposition to the summary judgment

23   motion. Doc. 71. Plaintiff filed an opposition, and then filed additional material without leave

24   three weeks later. The court accepted the material, denying Defendant's motion to strike. Doc.

25   97. Now, Plaintiff seeks to yet again submit additional material without leave. Plaintiff is

26   proceeding pro se, but she must follow the rules. The court can not continue to accept materials

27   as Plaintiff submits it. The court understands that the parties are still litigating the 2006 race and

28   national origin discrimination complaint in an EEOC administrative process. Evidence may be

uncovered in that case, but the court will not suspend this case until that process is complete.

Further, the materials Plaintiff submitted do not create a material dispute. As discussed above, the relevant issue is whether there was any causal link between Plaintiff's employment discrimination complaint and her receipt of a Level II determination. None of the materials speaks to this issue. First, no party asserts that Dr. Altman was a member of the Peer Review Committee or influenced the Level II determination in any way. Second, Plaintiff presents evidence that Dr. White e-mailed Dr. Altman about the case on November 1, 2006. There were further e-mails sent by Drs. Altman and Gaines which appears to have ended on November 3, 2006 with the news that the matter was before the Peer Review Committee. Doc. 100, Sealed. Dr. White, in her declaration, said that communications on this matter took place on October 31, 2006 and that she was never consulted again regarding Plaintiff's treatment of Patient. Doc. 65, Part 7, White Declaration, at 4:1-7. The discrepancy of one day does not appear to be material. Further, Dr. White does not appear to have been further consulted on the case; she sent out an initial e-mail and all further discussion was between Drs. Altman and Gaines. This material does not impeach Dr. White's credibility. The additional filing (Doc. 100) is stricken.


**IV. Order**

Defendant Department of Veterans Affairs's motion for summary judgment is GRANTED. Defendant's motion to strike is GRANTED.

IT IS SO ORDERED.

Dated:    September 30, 2011    

_____

CHIEF UNITED STATES DISTRICT JUDGE